**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

CALVARY CHRISTIAN CENTER,     )
                                            )
               Plaintiff,            )
                                            )
vs.                                       )     Case No. 3:11-cv-00342
                                            )
CITY OF FREDERICKSBURG,      )
VIRGINIA,                             )
                                            )
              Defendant.       )
_____ )

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS**

The Plaintiff submits this Memorandum of Law in opposition to Defendant's Motion to Dismiss.

## INTRODUCTION

The City asks this Court to dismiss Plaintiff's entire Complaint despite the fact that Plaintiff has plainly stated claims upon which relief can be granted. As demonstrated below, Plaintiff's Complaint is sufficient to state claims against the City for denial of a special use permit for the Church to operate a day school for disabled children as a part of its ministry.

In ruling on a 12(b)(6) motion, the Court accepts the factual allegations in the complaint as true and construes them in the light most favorable to the plaintiff. *See Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,* 591 F.3d 250, 255 (4th Cir. 2009). "Ultimately, a complaint must contain 'sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.''" *Id.* (quoting *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009)).

Although the Supreme Court in *Iqbal* and *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 570 (2007), changed the standard of pleading under Rule 8(a), it did "not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."  The Fourth Circuit recently stated, "Satisfying this 'context-specific' test does not require 'detailed factual allegations.'" *Nemet Chevrolet*, 591 F.3d at 256.  And, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556. Thus, viewing the facts in a light most favorable to the Plaintiff, the Court is only required at this stage of the proceedings to examine the allegations in the Complaint and determine whether Plaintiffs have stated a plausible claim for relief.  Even if a recovery seems "very remote and unlikely," *Speaker v. Centers for Disease Control*, 623 F.3d 1371, 1380 (11th Cir. 2010), the Court is required to deny the Motion to Dismiss.  Here, as demonstrated below, the Plaintiffs have adequately alleged claims against the City.  The City's Motion to Dismiss must be denied.

## I.      PLAINTIFF HAS STANDING TO BRING THE ADA AND RA CLAIMS.

Plaintiffs have standing to bring claims under the ADA and the RA "for injury it itself suffers because of its association with an ADA-protected third party." *A Helping Hand, LLC v. Baltimore County*, 515 F.3d 356, 3636 (4th Cir. 2008).  The Fourth Circuit looked at this issue in depth in *A Helping Hand*, and concluded that Congress plainly intended for those who provide services to the disabled to bring ADA claims because of injury they themselves had suffered as a result of their association with the disabled.  The Fourth Circuit noted the text of the ADA which allowed for such broad associational standing, and also noted the regulations implementing Title II of the ADA (the section under which Plaintiff proceeds) which "explicitly prohibit local governments from discriminating against entities because of the disability of individuals with

whom the entity associates." *Id*. at 364.  The court also noted that "every circuit that has considered whether a methadone clinic has standing under Title II of the ADA to bring a claim based on injuries resulting from its association with the addicted persons it serves has found that the clinic does have standing." *Id*.

The Church in this case is similar to a methadone clinic in that it seeks to provide direct services to disabled students.  A methadone clinic aids in the recovery of drug-addicted persons which the ADA considers to be disabled.  As the Fourth Circuit stated, a methadone clinic has "far more than a loose association with disabled patients; the Clinic's sole raison d'etre is the full time provision of treatment and services to recovering drug addicts." *Id*. at 364 n.4.  Here, the raison d'etre of the day school at the Church would be the full time provision of treatment and services to disabled children.  If every circuit court to consider the issue has held that a methadone clinic has standing under the ADA, then the Church has standing here as there is very little relevant difference between a methadone clinic assisting the disabled and a day school for disabled children.

The City tries to argue that this case is similar to *Freilich v. Upper Chesapeake Health*, 313 F.3d 205 (4th Cir. 2002).  Yet *Freilich* is completely inapplicable for several reasons.  First, the Fourth Circuit held that Dr. Frelich did not have *third party standing* to bring suit for injury to the disabled patients that she sometimes advocated for. *Id*. at 214-15.  The Fourth Circuit rested its holding on this point on the fact that Dr. Frelich had not alleged that the patients could not bring suit themselves, something that was required for her to raise their claims under third party standing rules. *Id*. at 215.[1]  In this case, the Church does not bring a third party standing

---

[1] It is doubtful that the disabled children have standing to bring this lawsuit themselves for denial of the special use permit given the fact that they are minors, and that they do not have a property interest in the Church's facility.  Given this, the Church may even meet the test for third party standing to bring the lawsuit on behalf of the disabled students.

claim.  Rather, the Church brings a claim of its own injury based on its association with the disabled.  The distinction between third party standing and associational standing under the ADA is an important one.  The Fourth Circuit in *A Helping Hand* stated that third party standing is based on injuries suffered by the third parties and raised by someone else.  But associational standing under the ADA "permits a plaintiff to bring suit on its own behalf *for injury it itself suffers* because of its association with an ADA-protected party." *A Helping Hand*, 515 F.3d at 363 n.3.

In addition, Dr. Freilich's attempt to raise an associational standing claim under the ADA failed because she only alleged that she had a "loose association" with her patients.  The main defect of Dr. Freilich's associational standing claim was that she did not allege a specific association with a disabled individual and instead contended that she was punished because of her advocacy on behalf of disabled patients. *Freilich*, 313 F.3d at 215-16.  The Fourth Circuit held that "such generalized references to association with disabled persons or to advocacy for a group of disabled persons are not sufficient to state a claim for associational standing under the ADA." *Id*. at 216.  In contrast, in this case, the Church has far more than a loose association with the disabled. It seeks to operate a day school that will exist for the sole reason of providing treatment and services to the disabled.  That association, like the association a methadone clinic has with its patients, is sufficient for an associational standing claim under the ADA.

The Fourth Circuit specifically discussed the *Freilich* case in *A Helping Hand* in such a way that leaves no doubt that *Freilich* is inapplicable in this case.  The court stated:

> In *Freilich*, we initially addressed a question not at issue here-whether the plaintiff doctor had third-party standing to bring a Title II ADA claim on behalf of her patients. We held that she did not because she had not alleged "sufficient obstacles to the patients bringing suit themselves." *Id*. at 215. Dr. Freilich alleged no Title II associational discrimination claim, like the claims asserted by the Clinic here. The doctor did allege a Title III associational discrimination claim

based on her "patient advocacy." *Id.* We also rejected this claim-but not because
we questioned the existence of associational discrimination claims or because we
(like the County in the case at hand) equated an associational discrimination claim
to one of third-party or associational standing. Rather, we had no trouble
recognizing that Title III provided for associational discrimination claims, but
concluded that Dr. Freilich's complaint did not state such a claim because she
alleged only "a loose association with disabled patients." *Id.* at 216. We properly
reasoned that "generalized references to association with disabled persons or to
advocacy for a group of disabled persons are not sufficient to state a claim for
associational discrimination under the ADA." *Id.* We do not in any way retract
those words. The Clinic, however, has alleged and offered overwhelming (indeed,
undisputed) evidence of far more than a "loose association with disabled
patients"; the Clinic's sole raison d'etre is the full-time provision of treatment and
services to recovering drug addicts.

*Id.* at 364 n.4.  While the Church does not exist solely for the purpose of running the day school,

it does exist to operate various ministries, one of which is the day school.  And associational

standing is more broadly construed under the ADA than even in *A Helping Hand*.  In *Schneider

v. County of Will*, 190 F.Supp.2d 1082 (N.D. Ill. 2002), the court held that a bed and breakfast

that had handicapped-accessible rooms had standing to sue for denial of a zoning permit.  The

court in that case noted the breadth of associational standing intended under the ADA, noting

that it even extended as far as protecting "the known association between a proposed business

and its targeted customers." *Id.* at 1089 (citing *Discovery House, Inc. v. Consolidated City of

Indianapolis*, 43 F.Supp.2d 997 (N.D.Ind.1999)).[2]

The Church has alleged that it was injured by the denial of the zoning permit because of

its association with the disabled.  That is enough for the Church to have standing under the ADA

and the RA.  Defendant's Motion to Dismiss must be denied.

---

[2] The *Schneider* court also distinguished the *Freilich* case on the grounds mentioned above, that there
"was no actual or even proposed relationship between the plaintiffs-advocates and the intended
beneficiaries of their advocacy." *Schneider*, 190 F. Supp. 2d at 1089.

## II.      SAFETY IS AN INVALID JUSTIFICATION FOR DENYING THE CHURCH'S SPECIAL USE PERMIT.

Defendant cites to 42 U.S.C. §12182(b)(3) and argues that, "The only truly safe measure to ensure that the daycare students are protected from possible hazards associated with the operation of the day school would be to not operate both programs out of the same building." Defendant's Motion to Dismiss at 8.  The City rests its denial on the fact that it believed the day school students posed a safety risk to the daycare students at the Church.  This is a significant admission from the City that proves that the disabled status of the children in the day school was a motivating factor in its decision to deny zoning approval to the Church.  *See Baird v. Rose*, 192 F.3d 462, 468 (4th Cir. 1999) (holding that ADA Plaintiffs only need to demonstrate that disability was a "motivating cause – as opposed to the sole case – of discrimination.").  By arguing that the day school students, by reason of their disability, would pose a safety risk to the daycare students, the City has conceded that the disability of the day school students was a motivating factor in its decision to deny zoning to the Church.

While safety concerns might be a valid justification in some circumstances, ADA case law requires that the entity discriminating have some valid justification or basis for the safety concerns.  It has never been enough for a government entity to point to an unjustified and unsupported assertion of safety to justify discriminatory action against the disabled.  The section cited by the City states:

> Nothing in this subchapter shall require an entity to permit an individual to participate in or benefit from the goods, services, facilities, privileges, advantages and accommodations of such entity where such individual poses a direct threat to the health or safety of others. The term "direct threat" means a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures or by the provision of auxiliary aids or services.

42 U.S.C. §12182(b)(3).  The term "direct threat" is essential to understanding this provision of

the ADA.  The U.S. Supreme Court has held that the "risk assessment must be based on medical

or other objective evidence," and that the direct threat of a safety risk must be based on

"objective, scientific information." *Bragdon v. Abbott*, 524 U.S. 624, 649 (1998); *See also New

Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 306 (3d Cir.2007) ("The purported

risk must be substantial, not speculative or remote.").  The regulations implementing the ADA

require that the entity making the direct threat determination must:

> make an individualized assessment, based on reasonable judgment that relies on
> current medical knowledge or on the best available objective evidence, to
> ascertain: the nature, duration, and severity of the risk; the probability that the
> potential injury will actually occur; and whether reasonable modifications of
> policies, practices, or procedures will mitigate the risk.

28 C.F.R. § 36.208(c).  In this determination, though, "the ADA does not sanction 'deprivations

based on prejudice, stereotypes, or unfounded fear.'" *Sch. Bd. of Nassau County v. Arline,* 480

U.S. 273, 287 (1987); *See also* 28 C.F.R. Pt. 35, App. A at 461 (1995) ("Safety requirements

must be based on actual risks and not on speculation, stereotypes, or generalizations about

individuals with disabilities.").  "The focus is on the objective reasonableness of Defendants'

assessment of the significance of the risk…." *Doe v. Deer Mountain Day Camp, Inc.*, 682 F.

Supp. 2d 324, 346 (S.D.N.Y. 2010).  The ADA regulations specify:

> The determination that a person poses a direct threat to the health or safety of
> others may not be based on generalizations or stereotypes about the effects of a
> particular disability. It must be based on an individualized assessment, based on
> reasonable judgment that relies on current medical evidence or on the best
> available objective evidence, to determine: the nature, duration, and severity of
> the risk; the probability that the potential injury will actually occur; and whether
> reasonable modifications of policies, practices, or procedures will mitigate the
> risk. This is the test established by the Supreme Court in *Arline*. Such an inquiry
> is essential if the law is to achieve its goal of protecting disabled individuals from
> discrimination based on prejudice, stereotypes, or unfounded fear, while giving
> appropriate weight to legitimate concerns, such as the need to avoid exposing
> others to significant health and safety risks.

28 C.F.R. Pt. 35, App. A at 455-56 (1995).

It is not up to the Plaintiff to prove that the day school students posed no safety risk to the daycare students.  Rather, a defendant "asserting a 'direct threat' as a basis for excluding an individual bears a heavy burden of demonstrating that the individual poses a significant risk to the health and safety of others." *Lockett v. Catalina Channel Express, Inc*., 496 F.3d 1061, 1066 (9th Cir.2007) (citing *Bragdon*, 524 U.S. at 649-50).

Here, the City's "safety" analysis was not reasonable nor was it based on any objective medical or scientific evidence.  In fact, the City's "safety" concerns were contrary to the evidence.  The Church was a licensed facility by the Department of Education to operate a day school for children with emotional disability and other health impairment, speech, or language impairment. *See* Verified Complaint at ¶58; Exh. E.  The education and health professionals reviewed the Church's application and specifically licensed the Church facility to operate the day school.  The agencies that licensed the school are tasked with oversight of the school to ensure the safety of the facilities and students, and to ensure compliance with all laws and regulations. The Virginia Department of Education has promulgated specific rules and regulations governing the operation of private day schools for students with disabilities. *See* 8 V.A.C. §20-670-10, *et seq.*[3]  The DOE Regulations require an application and inspection of the facilities before a license may be granted to operate a day school.  *See* 8 V.A.C. §20-670-20.  The Regulations specify that, "The department shall schedule periodic monitoring visits to each school for students with disabilities at least once every three years.  Unannounced visits by department staff may be made during the three[-]year time period." 8 V.A.C. §20-670-230.  Every three years, a day school must file an application to have its license renewed. *See* 8 V.A.C. §20-670-330.  The

---

[3] The Regulations are also available on the Department of Education's website in consolidated PDF format at the following link:
http://www.doe.virginia.gov/special_ed/day_residential_schools/private_day_schools/regulations.pdf

Department may refuse, deny, revoke, or suspend a  license for various grounds, including "[f]ailure to safeguard the interests of the public." 8 V.A.C. §20-670-350.  The Department is also allowed to investigate complaints from "individuals and other sources concerning alleged violations of the Code or regulations by a school." 8 V.A.C. §20-670-370.  The upshot of the regulations is that a private day school for disabled students is inspected, licensed, and highly regulated by the Department of Education.  The Department contains the expertise necessary to evaluate the safety of the students and others and, in this case, made a determination that the Church's day school met all the requirements for licensure.  The City Council disregarded and completely ignored the professional expertise of the Department of Education that stood in direct juxtaposition to the "safety" concerns verbalized by the council members.  The City Council set itself up as the experts in the field of disabled students, and a "super licensing" body for private day schools.  It grabbed for itself powers it did not have and did not have the expertise to administer.

In an effort to bolster the "safety" concerns, the City claims that Councilman Ellis consulted with a teacher, a social worker, and a rehabilitation specialist.  Yet there is no indication that the unnamed "professionals" Councilman Ellis consulted with knew of the specific disabilities of the students in the day school, their specific history, or whether the students ever had a history of safety issues.[4]  The City never asked for any specific information about the individual disabilities of the children in the day school and never consulted with any of the professionals who had actually interacted with the children.  The City never consulted with the professionals who were a part of the IEP team that was put together and who recommended that the students be transferred from the general population of the public school to a private day

---

[4] In fact, we do not even know who these unnamed individuals are and what they exactly said. Councilman Ellis simply reported generalities about his conversations with them.  Plaintiff objects to their opinion as hearsay unless these individuals are present to testify themselves and be cross-examined.

*Calvary Christian v. Fredericksburg* – Memo in Support of Motion for PI

school setting.  The City never asked to see the individualized education plans for the students in the day school and never asked why the decision was made to recommend transfer of the students to a private day school setting.  The City never took into consideration that the students in the day school had come from the general population in a public school and never asked whether the students posed any safety risk to the other students when they were in the public school.  Nor could the City get such information given the privacy concerns related to student records.  In fact, the inability of the City Council to obtain the necessary objective information it needs to make a serious and credible determination regarding whether its "safety" concerns were justified illustrates the absurdity of the City Council's actions in this case.  It neither has the power nor the expertise to make such a "safety" determination and instead should have relied upon the license granted by the DOE who was tasked with making such determinations and who issued a license to the day school. *See* Complaint at ¶58, Exh. E.

In all, the City's supposed "safety" evaluation was manifestly unreasonable and was certainly not based upon objective, scientific or medical evidence.  A cursory review of how the City handled its so-called "safety" concerns demonstrates that the safety concerns were completely unjustified and were based on nothing more than prejudices, stereotypes, or unfounded fear of the disabled.

The City cites to *Montalvo v. Radcliffe*, 167 F.3d 873 (4th Cir. 1999), to support its "safety" consideration.  In *Montalvo*, a child with AIDS was denied admission to a karate class. The karate class denied admission because of the risk of blood to blood contact through the sparring that occurs in the class.  The court found that the risk of blood to blood contact and the fact that there is no cure for the AIDS virus was sufficient to pose a direct threat to the safety of the other children in the karate class. *Id*. at 876-78.  The City also cites to *Doe v. University of*

*Maryland Medical System Corp.*, 50 F.3d 1261 (4th Cir. 1995), which found that an HIV positive medical resident in neurosurgery posed a direct safety threat to the patients under his care.  In that case, in contrast to the case here, the hospital made an objective determination and relied upon the CDC and its medical judgment in restricting the practice of the medical resident. *Id*. at 1264-66.

The *Montalvo* and *Doe* cases are factually inapposite.  Both of the defendants in those cases had specific information about the disability of the individual involved and relied upon irrefutable scientific and medical evidence to make their determinations that the individual posed a direct safety risk.  In this case, by contrast, the City did not even know what the specific disabilities of the children in the day school were.  The complete lack of objective, scientific, or medical evidence in this case sets it apart from the situations involved in *Montalvo* and *Doe*.

The City had no objective basis to determine that the students involved in the day school posed *any* safety risk.  The City did not meet its "heavy burden"[5] of demonstrating sufficient facts that would lead to an objective decision that the students in the day school posed a safety risk to the students in the day care.

## III.    PLAINTIFF HAS SUFFICIENTLY ALLEGED A CLAIM UNDER THE REHABILITATION ACT.

The City argues that Plaintiff's Rehabilitation Act claim should be dismissed because Plaintiff did not allege that disability was the sole reason for the discrimination.  Although it is true that Rehabilitation Act claims require a Plaintiff to prove that the discrimination was "solely

---

[5] The City argues that its position on the "safety" issue need only pass a rational basis review.  For this proposition, the City cites the *Doe* case. *See* Defendant's Motion to Dismiss at 8 n.2.  The City could not be more wrong on this point.  The portion of the *Doe* decision the City cites is the court's analysis of *Doe's* Equal Protection claim, not *Doe's*  ADA claim.  The court in *Doe* did not hold that a safety risk evaluation under the ADA need only pass a rational basis review.  Rather, the *Doe* court held that the record in that case demonstrated that the safety evaluation was "thoroughly deliberated." *Id* at 1266.  The City mistakenly imports an Equal Protection analysis on to an ADA claim.

by reason" of the individual's disability, the Church here has alleged that "Defendant's decision to deny Plaintiff's request for a special use permit was a direct result of animus towards children in the day school." Verified Complaint at ¶146. And that, "Defendant has no legitimate, nondiscriminatory reason for denying Plaintiff's request for a special use permit." *Id*. at ¶147. Plaintiff has alleged that discrimination was the reason behind the decision of the City Council to deny the special use permit and that it had no other justification. That allegation is all that is required at this stage of the case. But the Plaintiff also alleged that the disabled status of the students was the reason why the City Council denied the Church's application. *See* Verified Complaint at ¶¶ 76-81, 91-94, 98, 107-109. These allegations, and the reasonable inferences from the allegations provide sufficient detail for the Plaintiff's allegation that the sole reason for the denial of the special use permit was the disabled status of the students. Defendant's Motion to Dismiss must be denied.

## IV.   PLAINTIFF HAS SUFFICIENTLY ALLEGED A RLUIPA CLAIM.

### A.   The operation of a Day School for mentally and emotionally disabled children as a ministry of Calvary Christian Church is a religious exercise of the Church.

The City contends that Plaintiff has not sufficiently alleged that the operation of the day school will be religious in order to raise a RLUIPA claim. Yet Plaintiff has alleged that the Church has a sincere religious belief that flows from the Bible to minister to mentally and emotionally disabled children. *See* Verified Complaint at ¶¶40-42. The Complaint also alleges that the day school will be operated as a ministry of the Church. *See id.* at 46. The Complaint alleges that the Church desires to operate a day school from its location in accordance with its religious beliefs and that because of the Council's denial of the special use permit, the Church is unable to minister to the children in the day school and will have to forego those ministry

opportunities in the future. *See id.* at 113-114.  The Church also alleged in the Complaint that, "If the day school cannot move into the Church, Calvary will be prohibited from exercising its religious beliefs in ministering to children with disabilities." *See id*. at 118.  These allegations, taken as true, plainly allege that the operation of the day school is religious and that it is a ministry of the Church.

Courts that have looked at the operation of schools by churches and religious organizations have understood that they are entitled to protection under RLUIPA.  "Numerous courts analyzing RLUIPA claims have found facilities used for religious education to fall under RLUIPA's protection." *Westchester Day School v. Village of Mamaroneck*, 417 F. Supp. 2d 477, 545 (S.D.N.Y. 2006) (citing examples).  RLUIPA itself defines the term "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. §2000cc-5(7)(A).  RLUIPA also provides that, "The use, building, or conversion of real property for the purpose of religious exercise shall be considered… religious exercise." *Id*. at §2000cc-5(7)(B).  The Church has alleged that it wants to use its facility for religious exercise of operating a day school as part of its sincerely held religious beliefs.  That is enough to bring it within RLUIPA's protection and to deny Defendant's Motion to Dismiss.

The City cites to case law from state courts in different jurisdictions where certain parts of church facilities have been found to not fall within RLUIPA"s protections because they were not "fundamental" or "intimately connected" with the religion of the church. *See New Life Worship Ctr. v. Town of Smithfield*, C.A. No. 09-0924 (R.I. Super. 2010); *Greater Bible Way Temple v. City of Jackson*, 733 N.W. 2d 734 (Mich. 2007); *Ridley Park v. Zoning Hearing Bd.*, 920 A.2d 953 (Pa. Cmmwlth. 2007).  These holdings are of doubtful validity.

The *Greater Bible Way Temple* case is completely inapposite.  In that case, the Church

sought zoning approval to build an apartment complex. *See* 733 N.W.2d at 377.  The court in

that case held that building an apartment complex was something that is generally considered to

be a commercial venture and not a religious exercise. *Id.* at 394.  The church in that case never

presented evidence that the apartment complex would be used as religious exercise so the court

held that building an apartment complex, without more, was not religious exercise under

RLUIPA. *Id.*  In contrast, in this case, churches have traditionally begun schools and many cases

have recognized that religious education in a church setting is religious exercise protected by

RLUIPA.  *See Westchester Day School,* 417 F. Supp. 2d at 545.  The Church has presented

allegations that it is operating the day school as a ministry of the Church and that the day

school's reason for existence - ministering to the disabled - flows from the religious beliefs of the

Church.  This is sufficient to not only distinguish the case from *Greater Bible Way*, but also to

deny Defendant's Motion to Dismiss.

The *Ridley Park* case from Pennsylvania analyzed a church's application to operate a

private for-profit day care in the church under a Pennsylvania Statute called the Religious

Freedom Protection Act which defines the exercise of religion differently than RLUIPA. *See* 920

A.2d at 959.  Under that definition, the court held that a day care was "not a fundamental

religious activity of a church." *Id.* at 960.  This stands in direct conflict with the express

definition of the term "religious exercise" in RLUIPA which defines the term as "any exercise of

religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C.

§2000cc-5(7)(A).  RLUIPA, by its express terms rejects the kind of "centrality" approach

adopted by the Pennsylvania court in *Ridley Park*.  In addition, the Supreme Court has

specifically rejected the "centrality" analysis employed in those decisions.  In *Employment

Division v. Smith,* 494 U.S. 872, 886-87 (1990), the Supreme Court stated:

Nor is it possible to limit the impact of respondents' proposal by requiring a "compelling state interest" only when the conduct prohibited is "central" to the individual's religion.  It is no more appropriate for judges to determine the "centrality" of religious beliefs before applying a "compelling interest" test in the free exercise field, than it would be for them to determine the "importance" of ideas before applying the "compelling interest" test in the free speech field. What principle of law or logic can be brought to bear to contradict a believer's assertion that a particular act is "central" to his personal faith? Judging the centrality of different religious practices is akin to the unacceptable "business of evaluating the relative merits of differing religious claims."  As we reaffirmed only last Term, "[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." Repeatedly and in many different contexts, we have warned that courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim.

The Fourth Circuit has likewise rejected a "centrality" analysis under RLUIPA.  In *Lovelace v. Lee,* 472 F.3d 174, 187 n.2 (4th Cir. 2006), the Fourth Circuit stated that "courts must not judge the significance of the particular belief or practice in question. RLUIPA bars inquiry into whether the belief or practice is central to a [church's] religion." (internal marks omitted). The *Ridley Park* case is of no value in deciding this case.

In *New Life Worship Center*, an unreported case from the Rhode Island Superior Court (which is certainly of limited persuasion in this Court),[6] the court held that the operation of a commercial fitness center was not considered an automatic religious exercise of the church.  But the testimony in that case established that the commercial fitness facility was designed to operate as a revenue generator for the Church's public high school. *See* Slip Op. at 24-25.  In contrast, the day school in this case will be operated as a ministry of the Church and flows from the religious beliefs of the Church.

---

[6] Rhode Island Supreme Court Rule, Art. I, Rule 16(j) states that "Unpublished orders will not be cited by the Court in its opinions and such orders will not be cited by counsel in their briefs. Unpublished orders shall have no precedential effect."  This Court should not give effect to a case as persuasive authority that the Rhode Island Courts would not even consider.

Plaintiff has sufficiently alleged that the day school is the religious exercise of the Church and case law authoritatively establishes that education is generally considered the religious exercise of a church and is thus entitled to protection under RLUIPA. Defendant's Motion to Dismiss must be denied on this point.

> **B.      The denial of the special use permit has substantially burdened the Church's religious exercise.**

The term "substantial burden" is not defined in RLUIPA, but the Fourth Circuit has defined it consistently with other circuit courts. *See Lovelace*, 472 F.3d at 187.  The Fourth Circuit has stated that a substantial burden exists when "a state or local government, through act or omission, puts substantial pressure on an adherent to modify his behavior or violate his beliefs." *Id.* (internal marks omitted).  This is a fairly broad definition of substantial burden. RLUIPA specifically states that, "[t]he use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose." 42 U.S.C. §2000cc-5(7)(B).  Therefore, it follows that an outright prohibition on the use of Plaintiff's property for religious exercise constitutes a substantial burden. *See Westchester Day School v. Village of Mamaroneck*, 417 F. Supp. 2d 477, 546 (S.D.N.Y. 2006) (holding that when a proposed use constitutes religious exercise, the government essentially concedes that by denying the use, it has burdened religious exercise in some degree).  It makes logical and practical sense, and is most faithful to RLUIPA's terms, that when a church is completely prohibited from pursuing a part of its religious exercise, that a substantial burden exists.

In *Cottonwood Christian Center v. Cypress Redevelopment Agency*, 218 F. Supp. 2d 1203 (C.D. Cal. 2002), the court found that denial of a zoning permit to build a church was a substantial burden because the church's current location was too small to accommodate its

growing membership.  Similarly, the Court in *Murphy v. Zoning Commission of the Town of New Milford*, 148 F. Supp. 2d 173 (D. Conn. 2001) *reversed on other grounds,* 402 F.3d 342 (2nd Cir. 2005), held that denial of a zoning permit to hold group prayer on property was a substantial burden under RLUIPA. *See also Westchester Day School*, 417 F. Supp. 2d at 547-48 (finding substantial burden in refusal to allow zoning permission for religious school).  These cases are consistent with RLUIPA's legislative history which states:

> The right to build, buy or rent [physical] space is an indispensable adjunct of the core First Amendment right to assemble for religious purposes.... Churches in general, and new, small, or unfamiliar churches in particular, are frequently discriminated against on the face of zoning codes and also in the highly individualized and discretionary processes of land use regulation. Zoning codes frequently exclude churches in places where they permit theaters, meeting halls, and other places where large groups of people assemble for secular purposes. Or the codes permit churches only with individualized permission from the zoning board, and zoning boards use that authority in discriminatory ways.

146 Cong. Rec. S7774, S7775 (joint statement of Senators Hatch and Kennedy on the Religious Land Use and Institutionalized Persons Act of 2000).  As one court put it, a church having "a place of worship…is at the very core of the free exercise of religion." *Vietnamese Buddhism Study Temple in Am. v. City of Garden Grove*, 460 F. Supp. 2d 1165, 1171 (C.D. Cal. 2006). Churches "cannot function without physical space adequate to their needs and consistent with their theological requirements.  The right to [have] such a space is an indispensable adjunct of the core First Amendment right to assemble for religious purposes." *Id*.

In this case, the Church has been completely prohibited from having its day school at its facility.  The City Council's decision does not make it a mere inconvenience on the Church. Rather, the City Council's decision to deny the special use permit for the day school stands as an insurmountable obstacle for the Church and an outright prohibition on the exercise of the Church's religious exercise.  This is a quintessential substantial burden on religion.  If it were

not, then RLUIPA would have no meaning.  RLUIPA was intended to prohibit substantial

burdens on the exercise of a church's religion in the zoning context.  Congress specifically cited

to a zoning board using its individualized permission authority in a discriminatory manner as the

target for RLUIPA's protections. *See* 146 Cong. Rec. S7774, S7775.  RLUIPA would be

rendered a nullity were it construed to not apply in instances where a Church has been

completely denied zoning permission to carry out a facet of its religious exercise.

    Plaintiff has sufficiently alleged that the City's decision constituted a substantial burden

on the Church's exercise of religion in violation of RLUIPA.

    **C.**    **The City has no compelling governmental interest that was advanced in the least restrictive means available.**

    The City has no compelling interest in denying the special use permit for the day school.

The City rests its entire compelling interest argument on the "safety" issue; namely that the day

school students would pose a safety risk to the students in the day care.  Yet, as seen above, this

is not even a rational basis for the City's decision as the City has no objective evidence upon

which to base this unjustified and generic "safety" concern for the students in the day care.

While it is true that protecting the safety of children can be generically considered a compelling

interest, *See Schleifer v. City of Charlottesville*, 963 F. Supp. 534, 543 (W.D. Va. 1997), the

compelling interest must  be based on objective fact for it to be considered valid in a particular

case.[7]  In this case, as demonstrated above, the City only had a generic and unjustified "safety"

concern that was not based on sufficient facts to make such a concern justifiable.

    In addition, a discriminatory motivation cannot be considered compelling.  As

demonstrated above, the City's "safety" concerns are discriminatory under the ADA and so

---

[7] The City curiously cites to *Forest Hills Early Learning Center v. Lukhard*, 728 F.2d 230 (4th Cir. 1984), for the proposition that safety of children is a compelling governmental interest. Yet the Court in that case made no such holding.

*Calvary Christian v. Fredericksburg* – Memo in Support of Motion for PI

should not be given any weight, and certainly cannot be characterized as compelling. Compelling state interests are "interests of the highest order." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993). "It is basic that no showing merely of a rational relationship to some colorable state interest would suffice; in this highly sensitive constitutional area, 'only the gravest abuses [by religious adherents], endangering paramount interests, give occasion for permissible limitation [on the exercise of religion].'" *Sherbert v. Verner*, 374 U.S. 398, 406 (1963). A discriminatory rationale for a decision is not a compelling interest of the highest order.

Finally, an outright denial of permission to operate the day school cannot be considered the least restrictive means available. There are many other avenues the City could have taken rather than an outright prohibition on the day school at the Church. In fact, the State of Virginia has followed some of these alternatives in the licensing standards for private day schools discussed above. The City could have required re-inspections of the facility, could have required the Church to report any safety incidents to it, or could have easily and simply relied upon the inspections and licensing conducted by the State Department of Education as a least restrictive means. Yet the City completely prohibited the day school. This outright prohibition is not the least restrictive means available.

In sum, Plaintiff has sufficiently stated a RLUIPA claim and Defendant's Motion to Dismiss must be denied.

## V.     PLAINTIFF HAS SUFFICIENTLY ALLEGED A FREE EXERCISE CLAIM.

The City feigns confusion in trying to ascertain Plaintiff's Free Exercise claim alleged in its Complaint. But the allegations of a free exercise claim are plain . Plaintiff has specifically

stated in the Complaint that it is the "denial of Plaintiff's special use permit" that constituted a violation of the Free Exercise Clause. *See* Complaint at ¶¶164-175.

The general rule under the Free Exercise Clause is that a neutral law of general applicability may burden religious exercise. *See Employment Div., Dep't of Human Resources of Oregon v. Smith*, 494 U.S. 872, 877 (1990). There are exceptions, though, to this general rule. If a law is not neutral or generally applicable, then it is unconstitutional. *See id.* at 878. In addition, any law which permits individualized, discretionary exemptions and burdens religious conduct is unconstitutional. This avoids a situation where a law is facially neutral and generally applicable in theory, but in practice applied to discriminate against religiously-motivated conduct. *Smith*, 494 U.S. at 884. Several courts have found that zoning laws requiring permits involve individualized assessments. *See Fortress Bible Church v. Feiner*, 734 F. Supp. 2d 409, 498-99 (S.D.N.Y. 2010) (citing list of cases so holding); *cf. Lighthouse Inst. For Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 276-77 (3d Cir. 2007) (holding that zoning law was not system of individualized assessments). Because the Church was required under the City's zoning code to apply for a special use permit and the City made an individualized assessment as to whether the Church is entitled to the permit, the zoning code is not a neutral law of general applicability. Plaintiff specifically cited to these sections of the City's zoning code in its Complaint. *See* Complaint at ¶¶ 36-39. The City's zoning code requires that an individualized assessment be made by the City Council when a church applies for a special use permit to operate a school in the zoning district at issue. That is enough to count the City's zoning code as not neutral or generally applicable.

After *Smith*, a free exercise claim no longer hinges on whether the law substantially burdens religion; it hinges on showing that the challenged law is either not neutral or not

generally applicable. *See Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 531-47 (1993) (striking down law under the Free Exercise Clause without considering whether it imposed a substantial burden on religion); *Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 170 (3d Cir. 2002) ("Under *Smith* . . . there is no substantial burden requirement when government discriminates against religious conduct"); *Hartmann v. Stone*, 68 F.3d 973, 979 n.4 (6th Cir. 1995) (because the challenged law is not neutral or generally applicable, the plaintiffs "need not demonstrate a substantial burden on the practice of their religion."). Thus, because the law is not neutral or generally applicable, it must be justified by a compelling interest that is advanced in the least restrictive means available. As stated above, the City cannot meet this high hurdle.

The City cites to *First Assembly of God v. Alexandria*, 739 F.2d 942 (4th Cir. 1984), for the proposition that revocation of a permit for a church to operate a day school did to violate the Establishment Clause. The analysis of whether a City's decision violates the Establishment Clause analysis is completely different than the analysis whether a City's decision violates the Free Exercise Clause. *Cf. Smith*, 494 U.S. at 872; *Lemon v. Kurtzman*, 403 U.S. 602 (1971). The two analyses do not overlap and answer completely different questions. Thus, the principles of *First Assembly of God* are inapplicable in this case.

Plaintiff has sufficiently alleged that the City's denial of the special use permit violated the Free Exercise rights of the Church. Defendant's Motion to Dismiss on this point must be denied.

## VI.     PLAINTIFF HAS SUFFICIENTLY ALLEGED A FREE SPEECH CLAIM.

The City argues that the Church's desire to have a day school does not implicate the free speech clause. Courts have recognized, though, that the construction and operation of a church

21

*Calvary Christian v. Fredericksburg* – Memo in Support of Motion for PI

and its ministries can trigger the Free Speech Clause.

> [T]here are cases stating or implying that zoning ordinances should be read as potential constraints on speech as well as the location in which speech occurs. In *City of Renton v. Playtime Theatres, Inc*., the Supreme Court analyzed a zoning ordinance restricting the location of adult movie theaters. 475 U.S. 41, 46-55, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). Notably, in rejecting a First Amendment challenge to the ordinance, the *Renton* court did not distinguish between the constitutionally-protected expressive activity occurring within the theaters and the physical theaters themselves. The challenge to the ordinance failed, in other words, not because zoning ordinances in general govern location and not expression, but because the particular ordinance under review did not violate the First Amendment. In *Schad v. Borough of Mt. Ephraim*, the Supreme Court invalidated convictions under a zoning ordinance barring live entertainment as violations of the First Amendment right to free expression. 452 U.S. 61, 77, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981). In *Cornerstone Bible Church*, the Eighth Circuit analyzed a restriction on a church's ability to locate in a city's central business district as a restriction on speech, and remanded to the district court the issue of whether the ordinance withstood scrutiny under time, place and manner analysis. 948 F.2d at 468-71. The court noted that the ordinance in question allowed "churches, and by implication organized religious speech" in some zones of the city but not others, "place[d] determinative weight on the fact that the proposed use is a church," and therefore provided that "religious content of the [zoning] applicant's speech can determine whether the City permits it to locate in the [challenged] zone." *Id*. at 468.

> In the face of these conflicting precedents, this court concludes that the Ordinance restricts speech and not non-expressive conduct. The most persuasive precedent before the court is the *Cornerstone Bible Church* opinion, which (a) distinguished between free speech and free exercise challenges, noting that a zoning ordinance barring churches from a business district does not significantly burden religious belief but may nevertheless infringe a congregation's freedom of speech; and (b) held that for zoning purposes, the dispositive factor triggering the zoning ordinance in question was ultimately the content of the congregation's speech in its property.

*Vineyard Christian Fellowship of Evanston, Inc v. City of Evanston*, 250 F. Supp. 2d 961, 980-981 (N.D. Ill. 2003). The operation of a ministry of a church is plainly filled with expressive content. The Church here proclaims to the City and the general public that it ministers to the disabled as part of the free exercise of its religion. This is expression entitled to protection under the First Amendment.

The City's citation to *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643 (10th Cir. 2006), is not to the contrary.  In that case, the Tenth Circuit did not specifically hold that the Church was not subject to protection under the Free Speech Clause, but instead analyzed the free speech claim under the ordinance at issue in that case and held that the Free Speech Clause was not violated. *Id.* at 656-58.  That is a different holding than simply saying that the church in that case was not entitled to any First Amendment protection at all.  It would be a ridiculous application of the Free Speech Clause if nude dancing is considered expressive conduct that triggers free speech concerns, but worship and religious exercise are not.  The case law is filled with instances where nude dancing triggers free speech analysis and protections. *See, e.g. City of Renton*, 475 U.S. at 41.  Given the fact that "private religious speech, far from being a First Amendment orphan, is as fully protected under the Free Speech Clause as secular private expression," *Capitol Square Rev. & Adv. Bd. v. Pinette*, 515 U.S. 753, 760 (1995), the religious speech and conduct engaged in by a church should be entitled to at least as much, if not more, protection than the private secular speech and conduct engaged in by "adult" businesses. *See also Murdock v. Pennsylvania*, 319 U.S. 105, 109 (1943) (stating that "worship in the churches and preaching from the pulpit" occupies a "high estate under the First Amendment.").

Plaintiff has alleged that the City's zoning code is an unconstitutional prior restraint on speech. *See* Complaint at ¶¶179-81.  This claim under the First Amendment rests on the fact that the City Council uses criteria for deciding whether to grant a special use permit that are vague, imprecise, and allow for subjective discrimination.  In *Lady J. Lingerie v. City of Jacksonville*, 176 F.3d 1358 (11th Cir. 1999), the Eleventh Circuit struck down as unconstitutional a set of factors Jacksonville used for deciding whether to grant a zoning exception.  The factors utilized by the City were that the proposed use:

(i) Will be consistent with the Comprehensive Plan, including any subsequent plan adopted by the Council pursuant thereto;

(ii) Will be compatible with the existing contiguous uses or zoning and compatible with the general character of the area, considering population density, design, scale and orientation of structures to the area, property values, and existing similar uses or zoning;

(iii) Will not have an environmental impact inconsistent with the health, safety and welfare of the community;

(iv) Will not have a detrimental effect on vehicular or pedestrian traffic, or parking conditions, and will not result in the generation or creation of traffic inconsistent with the health, safety and welfare of the community;

(v) Will not have a detrimental effect on the future development of contiguous properties or the general area, according to the Comprehensive Plan, including any subsequent amendment to the plan adopted by the Council;

(vi) Will not result in the creation of objectionable or excessive noise, lights, vibrations, fumes, odors, dust or physical activities, taking into account existing uses or zoning in the vicinity;

(vii) Will not overburden existing public services and facilities;

(viii) Will be sufficiently accessible to permit entry onto the property by fire, police, rescue and other services; and

(ix) Will be consistent with the definition of a zoning exception, and will meet the standards and criteria of the zoning classification in which such use is proposed to be located, and all other requirements for such particular use set forth elsewhere in the Zoning Code, or otherwise adopted by the Planning Commission.

*Id*. at 1369-70.  In striking down the factors used by the City of Jacksonville, the Eleventh Circuit stated, "None of the nine criteria is precise and objective.  All of them – individually and collectively – empower the zoning board to covertly discriminate against adult entertainment establishments under the guise of general 'compatibility' or 'environmental' considerations." *Id*. at 1362.  The Eleventh Circuit was quick to add that the factors may be used for uses that are not entitled to First Amendment protection, but that when a use triggers the First Amendment, the factors employed must be narrow and precise and curtail the subjectivity of the City Council.

The court in *Hollywood Community Synagogue v. City of Hollywood*, 430 F. Supp. 2d 1296 (S.D. Fla. 2006), applied the *Lady J.* analysis to a church zoning case.  The court stated, "Though the Eleventh Circuit's decision in *Lady J. Lingerie* dealt with the City of Jacksonville's regulation of adult entertainment establishments, it can readily be applied to the instant case, where the First Amendment Free Exercise Clause is implicated by the City of Hollywood's denial of a Special Exception for plaintiff's house of worship." *Id*. at 1327.  The court analyzed the factors utilized in the special exception process in that case and concluded, "As HCS has alleged that Article V provides officials far more than merely ministerial discretion, it has thus stated a claim for relief pursuant to the Supreme Court's vagueness jurisprudence." *Id*. at 1327. The same is true here.  The factors utilized by the City are impermissibly vague and they empower the City Council to covertly discriminate against churches, as occurred in this case. The factors for determining whether to grant a special use permit are not sufficiently precise or objective to curtail the potential for viewpoint discrimination.  The factors the City Council uses to decide on an application for a special use permit are whether the proposed use is

> (1) In harmony with the adopted comprehensive plan.
> (2) In harmony with the purpose and intent of the zoning district regulations.
> (3) In harmony with the existing uses or planned uses of neighboring properties.

Complaint at ¶38.  These are very similar to the factors struck down in *Lady J*., but the *Lady J.* factors were even more detailed than the generic three factors employed by the City here. The generic phrase "in harmony with" is neither precise nor objective and grants wide latitude to the City Council.  The factors may certainly be used to disguise discrimination against uses the City Council disapproves of, such as the Church's use here.

The Fourth Circuit struck down a policy of a school district on these grounds in *Child Evangelism Fellowship v. Montgomery County*, 457 F.3d 376 (4th. Cir. 2006).  In that case, the policy granted too much discretion to the school to determine what groups could access the take home flyer forum set up by the school.  The Fourth Circuit analyzed the restriction under the First Amendment and stated:

> The Supreme Court has long held that the government violates the First Amendment when it gives a public official unbounded discretion to decide which speakers may access a traditional public forum. *See, e.g., Forsyth County*, 505 U.S. at 129-33, 112 S.Ct. 2395; *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 769-72, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988); *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150-51, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969). Such unbridled discretion threatens two specific harms in the First Amendment context. First, its existence, "coupled with the power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused." *Lakewood*, 486 U.S. at 757, 108 S.Ct. 2138. Second, "the absence of express standards" renders it difficult to differentiate between a legitimate denial of access and an "illegitimate abuse of censorial power." *Id*. at 758, 108 S.Ct. 2138.

> The danger of such boundless discretion, therefore, is that the government may succeed in unconstitutionally suppressing particular protected speech by hiding the suppression from public scrutiny. As the Supreme Court has explained, "[a] government regulation that allows arbitrary application ... has the potential for becoming a means of suppressing a particular point of view." *Forsyth County*, 505 U.S. at 130, 112 S.Ct. 2395 (internal quotation marks omitted); see also *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) ("[T]he danger of censorship and of abridgment of our precious First Amendment freedoms is too great where officials have unbridled discretion over a forum's use.").

> Although the Supreme Court has not yet had occasion to apply the unbridled discretion doctrine outside the context of a traditional public forum, the dangers posed by unbridled discretion-particularly the ability to hide unconstitutional viewpoint discrimination-are just as present in other forums. Thus, there is broad agreement that, even in limited public and nonpublic forums, investing governmental officials with boundless discretion over access to the forum violates the First Amendment. *See, e.g., Atlanta Journal & Constitution v. City of Atlanta Dep't of Aviation*, 322 F.3d 1298, 1306-07, 1310-11 (11th Cir.2003); *DeBoer v. Village of Oak Park*, 267 F.3d 558, 572-74 (7th Cir.2001); *Lewis v. Wilson*, 253 F.3d 1077, 1079-80 (8th Cir.2001); *Summum v. Callaghan*, 130 F.3d 906, 919-20 (10th Cir.1997); *Sentinel Commc'ns Co. v. Watts*, 936 F.2d 1189, 1200 n. 11

(11th Cir.1991). *See also Southworth v. Bd. of Regents*, 307 F.3d 566, 575-80 (7th Cir.2002) (holding that unbridled discretion inquiry is a component of viewpoint discrimination analysis, which applies in all forums).

The Fourth Circuit went on to strike down the policy of the school district because "*nothing* in the policy prohibits viewpoint discrimination…." *Id*. at 387. The same is true in this case where there is nothing in the City's zoning code to prohibit viewpoint discrimination.

The Church has sufficiently alleged a Free Speech claim and Defendant's Motion to Dismiss on this point should be denied.

## CONCLUSION

Based on the foregoing, Plaintiff respectfully requests that this Court deny Defendant's Motion to Dismiss.

Respectfully submitted this 23 day of June, 2011.

  /s/ Erik W. Stanley_____       /s/ Matthew D. Fender_____

| | |
|---|---|
| Erik W. Stanley | Matthew D. Fender |
|   Kansas Bar No.: 24326 |   Virginia Bar No. 76717 |
|   estanley@telladf.org |   mfender@mcguirewoods.com |
| Kevin H. Theriot | **McGuireWoods LLP** |
|   Georgia Bar No.:  373095 | One James Center |
|   ktheriot@telladf.org | 901 East Cary Street |
| **Alliance Defense Fund** | Richmond, VA  23219 |
| 15192 Rosewood | (804) 775-1076 |
| Leawood, Kansas 66224 | (804) 698-2209 (facsimile) |
| (913) 685-8000 | Local Counsel for Plaintiff |
| (913) 685-8001 (facsimile) | |
| Attorneys for Plaintiff | |

*Calvary Christian v. Fredericksburg* – Memo in Support of Motion for PI

## CERTIFICATE OF SERVICE

I hereby certify that on the 23 day of June, 2011, I filed the foregoing Memorandum of Law in Opposition to Defendant's Motion to Dismiss with the Clerk of the Court using the CM/ECF system which will send notice to:

Jennifer L. Parrish
  parrish@phslawfirm.com
Medford J. Brown
  brown@phslawfirm.com
Parrish, Houck & Snead, PLC
701 Kenmore Avenue, Suite 100
P.O. Box 7166
Fredericksburg, VA  22401-7166
(540) 373-3500
Attorneys for Defendant

  /s/  Matthew D. Fender           

*Calvary Christian v. Fredericksburg* – Memo in Support of Motion for PI