IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

CALVARY CHRISTIAN CENTER,

               Plaintiff,

v.                                     Civil Action No. 3:11-CV-342-JAG

CITY OF FREDERICKSBURG,

               Defendant.

## MEMORANDUM OPINION

In this case, the plaintiff, Calvary Christian Center ("Calvary"), challenges the denial of a special use permit by the City of Fredericksburg (the "City"). Calvary must obtain the permit in order to lease church space to the operator of a private day school for disabled children. Calvary requests the Court issue a preliminary injunction, pursuant to Federal Rule of Civil Procedure 65, enjoining the City from prohibiting Calvary's tenant from operating a day school in the church building.

The Court finds that Calvary has not met the burden required to obtain a preliminary injunction. For the reasons set forth below, the Court DENIES the motion for a preliminary injunction.

### I. Standard of Review

The requirements for preliminary injunctive relief are well established in the Fourth Circuit. Such relief is appropriate when the plaintiff establishes that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in the plaintiff's favor; and (4) an injunction is in the public interest.

*Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365, 374 (2008); *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346-47 (4th Cir. 2009), *vacated on other grounds*, 130 S. Ct. 2371 (2010). As the Fourth Circuit pointed out in *Real Truth About Obama*, *Winter* requires that a plaintiff make a clear showing that it will likely succeed on the merits at trial. *Real Truth About Obama, Inc.*, 575 F.3d at 346. This standard is far stricter than the requirements for preliminary injunctive relief in the Fourth Circuit prior to *Winter*. *See Real Truth About Obama*, 575 F.3d at 347. Moreover, "[a] preliminary injunction is an extraordinary remedy, which may be awarded only upon a clear showing that a plaintiff is entitled to such relief." *Scott v. Bierman*, No. 10-1483, 2011 WL 1807330, at *3 (4th Cir. May 12, 2011) (citation omitted).

Calvary requests mandatory injunctive relief. The traditional purpose of a preliminary injunction is to prohibit an action. Preliminary injunctions are meant to "protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003). Mandatory injunctive relief, however, alters the status quo by commanding or requiring a party to perform a positive act. In this case, Calvary requests that the Court require the City to grant a special use permit, which is a positive act that alters the status quo. The Fourth Circuit has viewed mandatory relief with caution, explaining that it "should be granted only in those circumstances when the exigencies of the situation demand such relief." *Id.* at 526 (citing *Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir. 1980)). "[A] mandatory preliminary injunction must be necessary both to protect against irreparable harm in a deteriorating circumstance created by the defendant and to preserve the court's ability to enter

2

ultimate relief on the merits of the same kind." *Id.* at 526.  Thus, the Court will treat Calvary's motion with more caution because it requests mandatory relief.

## II. Statement of the Material Facts

This case involves alleged violations of the Americans with Disabilities Act ("ADA"), the Rehabilitation Act ("RA"), the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), and the Free Exercise and Free Speech Clauses of the First Amendment.  The Court will focus on the facts and legal sufficiency of the ADA, RA, and RLUIPA claims, as Calvary has filed its motion for a preliminary injunction based on those three claims only.

The Court has conducted an evidentiary hearing in this matter.  The parties have also agreed that the Court should consider the affidavits and exhibits filed with the Court.  Based on the evidence presented, the Court has determined that the following narrative represents the material facts of this case for the purpose of resolving Calvary's motion for a preliminary injunction.

According to its pastor, Michael Hirsch, Calvary believes that the Bible mandates that it have a social ministry, tending to the weak and unfortunate in society.  In particular, the church members believe that they should provide services to children.  Thus, the church sought permission to operate a before and after school day care called Precious Moments Day Care ("PMDC").  In 2009, the City granted Calvary a special use permit to operate PMDC.  PMDC is licensed by the Commonwealth of Virginia as a religiously exempt child day care center for thirty-two children ages six through twelve years.  To date, however, no children have been enrolled in the program; in fact, the day care has never taken applications for children to attend.

Fairwinds Day School ("Fairwinds") is a day school for children with emotional and mental disabilities.  Fairwinds operates on a for-profit basis.  Ed Murphy ("Murphy") is the

director of Fairwinds.  Fairwinds enrolled twelve students in the 2009-2010 academic year.  To enroll at the school, a student must have an Individual Education Plan ("IEP") that determines the child has a qualifying disability and states that the child shall attend a private day school. Students in Fairwinds have been diagnosed with conditions such as PTSD related to child abuse, bi-polar disorder, speech and language impairment, pervasive development disorder, cognitive processing problems, reactive attachment disorder, and depression.

Significantly, Fairwinds has a history of violations of the Fredericksburg zoning ordinances.  It opened its first Fredericksburg location without having secured the proper zoning permit for a school.  After its first zoning violation became public, Fairwinds moved to another site, again without the proper zoning.  Now Fairwinds wants to move its business to the Calvary Church, and has asked the Church to obtain the required zoning approvals.

In 2010, Calvary applied for a special use permit to allow Fairwinds to move into its building.  Fairwinds would be a tenant of Calvary; the parties have not worked out the terms of the lease.  As planned, however, Fairwinds would have six full time staff at Calvary, and would operate in the hours between 8:30 a.m. and 3:00 p.m., utilizing two classrooms and office rooms on the second floor of the church building.

Calvary argues that the children at PMDC will have no conflict with students at Fairwinds.  PMDC would use two rooms on the first floor of the building, from 6:00 a.m. to 8:15 a.m. and from 3:30 p.m. to 6:00 p.m.  Ideally, the hours of operation of PMDC and Fairwinds would not overlap, and the children of the two facilities would not be in contact with each other. Yet, neither Fairwinds nor the Church has presented any plans on how to handle situations in which, due to transportation problems or similar issues, children from both programs are present in the building.  Indeed, since the Church has never opened PMDC, it has no experience in

4

whether parents encounter scheduling problems in picking up their children or, if such problems exist, how frequently they occur.  Further, contact between the Fairwinds and PMDC children is likely to occur, because PMDC is willing to enroll any child from Fairwinds for after-school care.

In preparing to lease space to Fairwinds, Calvary was required to apply for a special use permit, which the Fredericksburg City Council ("Council") has the sole authority to grant.[1] Raymond P. Ocel ("Ocel"), the Director of Planning and Community Development for the City, recommended approval of the special use permit for Calvary, and after two meetings, the planning commission also recommended that Council approve Calvary's application.

The Council met three times to consider Calvary's special use permit application.  Ocel submitted the planning commission's memorandum supporting approval.  At the third meeting, the Council voted three to three, with one member abstaining, on whether to issue the special use permit.  Because a motion fails on a tie vote, Calvary's application for a special use permit was rejected.

At the hearing before this Court, the three council members who voted against the grant of the special use permit testified as to their reasons for voting against the issuance of the special use permit.[2]  The Court found their testimony cogent and credible.  Council member Kerry P. Devine ("Devine") expressed four concerns: the City providing more than its share of services for the surrounding region; the inactive permit for PMDC and the fact that the City had never

---

[1] Calvary satisfied the inspections required by the Virginia Department of Social Services and the City's fire department.  The Virginia Department of Education, after an application and inspection process, issued a license to Calvary to operate a school for children with emotional disability and other health, speech, or language impairments.

[2] Normally testimony cannot be compelled from legislative officials to determine the intent of the legislature, but the council members in this case volunteered to testify, and neither party objected to the testimony.  *See EEOC v. Wash. Suburban Sanitary Comm'n*, 631 F.3d 174, 181 (4th Cir. 2011).

issued a second permit without the first one being put to use; Fairwinds's two prior zoning violations; and inconsistencies in the paperwork, such as requesting a permit from the Department of Education for eighteen students, while only requesting a special use permit to accommodate twelve students from the City.

Council member Bradford C. Ellis ("Ellis") believed that the close proximity of the two groups of children could present a danger to the students of PMDC should one of the Fairwinds students have an outburst. After the first meeting on October 26, 2010, Ellis sought several opinions from parents, teachers, and a licensed social worker regarding the safety of PMDC students in proximity to Fairwinds. He based his vote on those opinions and recommendations.

Finally, council member Mary K. Greenlaw ("Greenlaw") based her vote on a number of factors: the two prior zoning violations of Fairwinds; the fact that the City had never issued a second permit when the first was never put to use; and a specific complaint about one of Murphy's other group homes, lodged by a constituent, who claimed one of the residents had vandalized her property. Greenlaw also echoed the concerns of Devine and Ellis. At the council meeting on Fairwinds, she was busy facilitating the discussion and felt that she did not have to repeat those concerns for the rest of the Council.

### III. Discussion

In Count One of the Complaint, Calvary alleges that the City violated the ADA. Specifically, Calvary claims that the City regarded the potential students of Fairwinds as disabled and discriminated against them because of an actual or perceived physical or mental impairment. In Count Two of the Complaint, Calvary claims that the City violated the Rehabilitation Act for the same reasons as set forth in Count One, but did so solely on account of the potential students' disabilities. In Count Three of the Complaint, Calvary alleges that the City violated RLUIPA,

which protects persons and religious assemblies from zoning laws that impose a substantial burden on the free exercise of religion.

The Court finds that Calvary is not likely to prevail in this case. First, it is likely that Calvary lacks standing to pursue its ADA and RA claims. Further, even if Calvary satisfied the standing requirements, Calvary has not established that the ADA and RA claims are likely to succeed on the merits. In addition, the Court finds that Calvary has not established that it is likely to succeed on its RLUIPA claim. Finally, the Court finds that Calvary has not established the other elements necessary for a preliminary injunction: that it is likely to suffer irreparable harm, that the balance of equities favors it, and that granting preliminary relief serves the public interest.

### A. Likelihood of Success on the Merits

#### 1. ADA Claim

##### a. Standing

The purpose of the ADA is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Calvary has brought suit under Title II of the ADA, which states, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Id.* § 12132. Calvary claims that the City intentionally discriminated against it.

In this case, the issue of standing requires consideration of three distinct concepts: third-party standing, associational standing, and associational discrimination. The Fourth Circuit has

7

explained the differences among third-party standing, associational standing, and a cause of action based on associational discrimination as follows:

> The doctrine of third-party standing permits a plaintiff to bring suit on behalf of a third party *for injury done to the third party* in certain circumstances when the third party cannot effectively protect its own interest.   The doctrine of associational standing permits an organization to bring suit on behalf of its members *for injury done to its members* when (among other requirements) its members would have standing to sue in their own right.   Although these two standing doctrines differ, they are similar in that they both allow a plaintiff to bring suit based not on injury to itself but on injury to another.   In contrast, a cause of action based on ADA associational discrimination permits a plaintiff to bring suit on its own behalf *for injury it itself suffers* because of its association with an ADA-protected third party.

*A Helping Hand v. Baltimore Cnty.*, 515 F.3d 356, 363 n.3 (4th Cir. 2008) (internal citations omitted).   An entity with third-party or associational standing seeks relief for others.   In contrast, an entity that suffers associational discrimination suffers some kind of injury itself, and seeks relief for itself.

Examples of third-party standing frequently arise in First Amendment cases; the overbreadth doctrine allows a litigant to argue that the free speech rights of others are violated. *E.g., Peterson v. Nat'l Telecomms. & Info. Admin.*, 478 F.3d 626, 633-634 (4th Cir. 2007). Associational standing frequently arises in environmental litigation, where environmental groups assert the rights of their members to a clean environment.   *E.g. Am. Canoe Ass'n v. Murphy Farms*, 326 F.3d 505, 517 (4th Cir. 2003).   In contrast, a party claiming associational discrimination claims that, by associating with someone in a protected class, the litigant himself has suffered harm. *A Helping Hand*, 515 F.3d at 363.

Each of these three doctrines of standing has separate requirements that a litigant must meet.[3]   To establish third-party standing, the plaintiff must demonstrate: "(1) an injury-in-fact; (2) a close relationship between herself and the person whose right she seeks to assert; and (3) a hindrance to the third party's ability to protect his or her own interest." *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 215 (4th Cir. 2002) (citations omitted). In *Freilich*, the plaintiff alleged that the defendant violated Title II of the ADA (and the RA) by not providing in-hospital quality assurance and oversight for dialysis services, when it did so for all other hospital services.   The Fourth Circuit affirmed the district court's finding that there was "no evidence that Dr. Freilich's dialysis patients are hindered from presenting their own claims" and dismissed her claim on behalf of third parties. *Id.*

Dr. Frielich also asserted an associational discrimination claim under Title III, contending that the defendant denied her reappointment because of her advocacy on behalf of her patients. The Fourth Circuit rejected Dr. Frielich's claim, holding that "generalized references to association with disabled persons or to advocacy for a group of disabled persons are not sufficient to state a claim for associational discrimination under the ADA." *Id.* at 216.

In contrast, in *A Helping Hand v. Baltimore County*, the Fourth Circuit held that the operator of a methadone treatment clinic had standing to bring an association discrimination claim under Title II of the ADA.   515 F.3d at 364.   The Fourth Circuit distinguished the associational claim in *A Helping Hand* from that in *Frielich* as follows: "The [methadone] Clinic, however, has alleged and offered overwhelming (indeed, undisputed) evidence of far more than a loose association with disabled patients; the Clinic's sole raison d'etre is the full-

---

[3] Of course, the litigant must also satisfy the Article III standing requirements: (1) the plaintiff suffered an injury-in-fact; (2) the challenged conduct must cause the injury suffered; and (3) the injury will likely be redressed by a favorable decision.  *Goldstein v. Costco Wholesale Corp.*, 278 F. Supp. 2d 766, 769 (E.D. Va. 2003) (citations omitted).

time provision of treatment and services to recovering drug addicts." *Id.* at 364 n.4 (internal quotation marks omitted). Calvary contends that is has pled an associational discrimination claim, but Calvary has not alleged any unlawful discriminatory effect that Calvary itself suffered as a result of its association with the disabled students in its ADA and RA claims. Calvary seeks a special use permit to house the school; it does not intend to operate the school. At oral argument, Pastor Hirsch testified that the potential agreement between Calvary and Fairwinds would be a lease, under which Calvary would allow Fairwinds to operate on its premises. Furthermore, as Murphy testified, the curriculum of Fairwinds is secular. Under these facts, the Court finds that Calvary has not stated an associational discrimination claim—merely housing the day school clearly would not be the "raison d'etre" of Calvary, according to *A Helping Hand.* Rather, the plaintiff asserts a claim akin to that rejected in *Freilich*, based on the Church's "generalized references to association with disabled persons or to advocacy for a group of disabled persons." *Freilich*, 313 F.3d at 217. This level of association does not suffice to create associational standing.

Nor may Calvary claim third-party standing under the ADA or RA. In Counts One and Two of the Complaint, Calvary states that the denial of the special use permit adversely affected the "disabled children in the day school." (Compl. ¶¶ 134, 150.) This suggests that Calvary has brought a claim based on harm to the disabled children, not itself. Although the students and Fairwinds might have suffered an injury due to the City's denial of the special use permit, Calvary has put forth no evidence, either through pleadings or testimony, as to why Fairwinds or the disabled students are hindered from bringing suit on their own behalf. The third element required to bring a third-party claim, therefore, has not been met. Accordingly, the Court will "adhere to the longstanding principle that 'third parties themselves usually will be the best

proponents of their own rights.'" *Freilich*, 313 F.3d at 215 (quoting *Singleton v. Wulff*, 426 U.S. 106, 114 (1976)).[4]

Thus, the Court finds that Calvary is not likely to succeed under the ADA because it does not readily appear that Calvary has standing to sue.

b. Likelihood of Success on the Merits of the ADA Claim

Notwithstanding the Court's concern about Calvary's standing to pursue its ADA claim, the Court further finds that Calvary has not established that it is likely to succeed on the merits.

Title II of the ADA prohibits discrimination in public services. Under an exception in 42 U.S.C. § 12182(b)(3), however, a public entity is not required to permit a disabled individual to participate in the public accommodation "where such individual poses a direct threat to the health or safety of others." The statute defines "direct threat" as "a significant risk to the health or safety or others that cannot be eliminated by a modification of policies, practices, or procedures or by the provision of auxiliary aids or services." *Id.*

At oral argument, the parties made much of the City's concerns about the safety of students. Based on the current state of the record, however, the Court does not find the City's reliance on safety concerns to be persuasive. In determining whether a threat exists, the Court "must make 'an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence.'" *Id.* at 876-77 (quoting 28 C.F.R. § 36.208(c)).[5] It may be that the City relied upon such evidence, but it is not apparent

---

[4] Calvary does not claim associational standing for any of its claims.

[5] When interpreting the regulations that implement Title II, where questions of safety are involved, the regulations implementing Title III apply. *See A Helping Hand, LLC v. Baltimore Cnty.*, No. CCB-02-2568, 2006 WL 2067942, at *1 n.2 (D. Md. July 14, 2006) (order on motion in limine and motion to exclude evidence); *see also Start, Inc. v. Baltimore Cnty.*, 295 F. Supp. 2d 569, 577-78 (D. Md. 2003).

11

from the record at this time. For purposes of the preliminary injunction, the safety rationale, therefore, does not justify the City's decision.

The safety rationale does, however, fit into a larger matrix that relates to a different issue: whether the City had discriminatory intent. At the evidentiary hearing, the council members explained their many reasons (safety among them) for denying the special use permit. As explained above, these concerns included the lack of opportunity to observe Calvary implement the previously issued special use permit for PMDC, the prior zoning violations by Fairwinds, the safety of students, and other legitimate concerns. Significantly, none of these concerns have anything to do with the disabilities *per se* of the Fairwinds students; the reasons do not bespeak intent to discriminate.

Yet, to prevail, the plaintiff must show that discriminatory intent was one of the reasons for the decision to deny the permit. ADA plaintiffs must "demonstrate that their disability played a motivating role in the discriminatory action." *Manickavasagar v. VCU Sch. of Med.*, 667 F. Supp. 2d 635, 643 n.4 (E.D. Va. 2009). As noted above, the council members testified to reasons other than disability for their decision. The Court has found their testimony to be entirely believable.

The plaintiff has introduced no evidence to the contrary. Instead, Calvary argues that the City's concerns are somehow faulty. The accuracy of the City's judgment, however, is not at issue. Rather, the plaintiff must show the City's motive. An inaccurate reason is legitimate, so long as it is not discriminatory.[6] On the record as it now exists, Calvary has not shown discriminatory intent as a motivating factor and therefore is not likely to succeed on the merits of its ADA claim.

---

[6] The plaintiff has offered no evidence that the proffered reasons are pretextual.

12

## 2. Rehabilitation Act Claim.

### a. Standing

The issue of standing is the same under the RA as the ADA. *See, e.g.*, *Freilich*, 313 F.3d at 214 ("To the extent possible, we construe similar provisions in the [ADA and RA] consistently.") (citations omitted). The allegations under Count One and Count Two of the Complaint are the same. For the same reasons as discussed above, the Court finds that Calvary does not appear to have standing to pursue the RA claim.

### b. Likelihood of Success on the Merits of the Rehabilitation Act Claim

The plaintiff has not shown a likelihood of success on the merits of its RA claim. To prove a violation under section 504 of the Rehabilitation Act, a plaintiff must prove: "(1) that he has a disability; (2) that he is otherwise qualified for the employment or benefit in question; and (3) that he was excluded from the employment or benefit due to discrimination *solely* on the basis of disability." *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1265 (4th Cir. 1995) (emphasis added) (citation omitted). The RA has an entirely different, and stiffer, standard of causation than the ADA. The ADA prohibits discrimination against an individual "by reason of such disability," but the RA prohibits discrimination "solely on the basis of the disability."

Although the courts have held that the ADA and RA "should be construed to impose the same requirements when possible," *Baird v. Rose*, 192 F. 3d 4642, 469 (4th Cir. 1999), they have recognized the difference in causation.

> While the general requirements of a disability discrimination claim under the ADA and the Rehabilitation Act are the same, the standard of causation is not. Rehabilitation Act plaintiffs must demonstrate that the discrimination in question occurred "solely by reason of" their disability. ADA plaintiffs, on the other hand, need only demonstrate that their disability played a motivating role in the discriminatory action.

13

*Manickavasagar*, 667 F. Supp. 2d at 643 n.4 (internal citations omitted). Calvary has failed to produce any factual basis to conclude that the City denied the special use permit solely based on the students' disabilities.

Accordingly, the Court finds that Calvary has not established that its RA claim is likely to succeed on the merits.

### 3. RLUIPA Claim

Congress enacted the Religious Land Use and Institutionalized Persons Act in part to protect religious assemblies and their adherents from zoning laws that impose a substantial burden on the free exercise of religion. 42 U.S.C. §§ 2000cc, *et seq.* The basis of a RLUIPA claim is as follows:

> No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution (A) is in furtherance of a compelling governmental interest; and (B) is the least restrictive means of furthering that compelling governmental interest.

*Id.* § 2000cc(a)(1). RLUIPA broadly defines religious exercise as "[t]he use, building, or conversion of real property for the purpose of religious exercise" so long as the person, assembly, or institution "uses or intends to use the property for that purpose." *Id.* § 2000cc-5(7)(B). If a plaintiff produces prima facie evidence of a RLUIPA violation, "'the government shall bear the burden of persuasion on any element of the claim, except that the plaintiff shall bear the burden of persuasion on whether the [policy] or government practice that is challenged by the claim substantially burdens the plaintiff's exercise of religion.'" *Smith v. Ozmint*, 578 F.3d 246, 250 (4th Cir. 2009) (alteration in original) (quoting 42 U.S.C. § 2000cc-2(b)).

14

a. Religious Exercise

RLUIPA is aimed at protecting the religious exercise of a person or entity. *See* 42 U.S.C. § 2000cc(a)(1). The statute defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *Id.* §2000cc(7)(A). Although Calvary claims that the operation of Fairwinds day school on its premises is an exercise of its "sincere religious belief to minister to emotionally and mentally disabled children," (Compl. ¶ 40), Calvary has not pled sufficient facts to show that the curriculum and administration of the day school are anything other than secular. This failure weakens Calvary's claim that housing Fairwinds on its property is an expression of religion, because courts in several districts have held that structures used by religious organizations for secular purposes or non-religious activities are not automatically protected as an expression of religion. *See Westchester Day Sch. v. Vill. of Mamaroneck*, 417 F. Supp. 2d 477, 543 (S.D.N.Y. 2006) ("We are mindful of the Second Circuit's caution that RLUIPA cannot be so broad as to protect any construction plan merely because an institution pursues a religious mission."); *see also Living Water Church of God v. Charter Twp. of Meridian*, 258 Fed. App'x 729, 737 (6th Cir. 2007); *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 762 (7th Cir. 2003).

In *Westchester*, the court ultimately found that because the proposed extensions to the day school were inherently tied to traditional Jewish customs, a denial of a zoning variance would constitute a substantial burden on religious practice for all members of the school. In contrast, Calvary has not provided any factual support that suggests that the curriculum of the day school is religious in nature. At the hearing, Murphy underscored the secular nature of the Fairwinds curriculum. Following *Westchester*, it is not likely that Calvary's agreement with Fairwinds will amount to an expression of religion.

15

The Court finds it significant, albeit not dispositive, that Fairwinds is a for-profit school that would just happen to be housed in a church. In fact, Fairwinds intends merely to be a tenant of Calvary. Fairwinds will pay rent to the church, thereby helping to meet Calvary's financial needs. This arrangement is no different from any other landlord/tenant relationship. It is difficult to find that an organization can declare a secular activity to be part of its religious doctrine, and then rent space to a for-profit business to conduct that activity.

Calvary attempts to tie the operation of the day school to the church's social ministry. Most churches practice some sort of community ministry as an act of charity, but not every charitable activity is intimately related to religious beliefs. Calvary could well believe that Fredericksburg should provide more public transportation to families with lower incomes, but its belief could not authorize it to allow a bus company to open a depot at the church.

The Court must examine the relationship between the exercises prohibited by the government's regulations and the actual tenets of the religious entity. In *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643 (10th Cir. 2006), the Tenth Circuit held that an application to build a daycare on church grounds was not protected under RLUIPA because there was "no evidence that building a [daycare center] . . . [was] intimately related" to the religious tenets of the plaintiff. *Id.* at 654 (first alteration in original) (citation omitted). Applying the Tenth Circuit's holding to these facts, the Court finds that Calvary has not pled or produced enough evidence to show that the operation of a day school for the disabled is intimately related to Calvary's religious beliefs.

Accordingly, based on the above standards of determining what constitutes a religious exercise under RLUIPA, the Court finds that Calvary has not shown a likelihood of successfully proving that an independent corporation's operation of a for-profit school on church property

16

amounts to an exercise or expression of religion.   The relationship between the secular curriculum of Fairwinds and Calvary's religious beliefs is tenuous, and there are too many evidentiary gaps to allow the Court to conclude that Calvary is likely to succeed on the merits.

### b. Substantial Burden

Had Calvary's agreement with Fairwinds been a religious exercise, the church would then have to prove that the City's denial of a special use permit substantially burdens Calvary's religious exercise.  RLUIPA provides no definition for the term "substantial burden."  In the context of the Free Exercise Clause, the Fourth Circuit has defined substantial burden as one that

> "put[s] substantial pressure on an adherent to modify his behavior and to violate
> his beliefs," or one that forces a person to "choose between following the precepts
> of her religion and forfeiting [governmental] benefits, on the one hand, and
> abandoning one of the precepts of her religion . . . on the other hand."

*Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006) (alterations in original) (quoting *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981); *Sherbert v. Verner*, 374 U.S. 398, 404 (1960)).

Calvary argues that by prohibiting the operation of the day school on its property, the City has substantially burdened Calvary's exercise of its religious beliefs.  Central to Calvary's argument is the allegation that "the only place where the Church can house the ministry of the day school" is on its grounds in one of the ministry buildings.  (Pl.'s Supp. Mem. 12.)  The Fourth Circuit has not addressed a RLUIPA claim in the context of opening a for-profit school in a church.  A number of courts, however, have dealt with construction of religious facilities in general.  In *Reaching Hearts International, Inc. v. Prince George's County*, 584 F. Supp. 2d 766 (D. Md. 2008), the District of Maryland found that the county's denial of a re-classification of the sewer system, which made it impossible for a congregation to build anything on its newly purchased land, constituted an undue burden.  Central to the court's decision were the substantial

amount of money that the church had spent (and wasted), the unreasonable delay in getting the matter resolved, and the church's lack of alternatives, since its prior location was too small to accommodate the congregation.   *Id.* at 786 (explaining that the plaintiff church expended hundreds of thousands of dollars with the expectation that it would be able to obtain a zoning variance, build a structure upon the land, and pay off the mortgage).   Calvary has not provided facts showing it will be burdened financially by the denial of its special use permit, or that there is a lack of alternate locations that could house Fairwinds.   While Murphy testified that Fairwinds wanted to operate only at Calvary's facility, the plaintiff provided no supporting information about the lack of any feasible alternatives, thereby weakening Calvary's claim that it is substantially burdened by the denial of the special use permit.

Another district court within the Fourth Circuit recently held that a substantial burden occurs when "'a land-use regulation that imposes a substantial burden on religious exercise is one that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise—including the use of real property for the purpose thereof within the regulated jurisdiction generally—effectively impracticable.'"   *Dixon v. Town of Coats*, No. 5:08-CV-489-BR, 2010 WL 2347506, at *5 (E.D.N.C. June 9, 2010) (quoting *Civil Liberties for Urban Believers v. City of Chicago,* 342 F.3d 752, 761 (7th Cir. 2003)).   In *Dixon,* the evidence presented by the plaintiff failed to show that the denial of a zoning variance would render religious exercise completely impracticable, since other zones in the town allowed for the construction and maintenance of religious structures.   *Id.* at *6.   As mentioned above, Calvary has not pled facts to show a lack of alternatives to the proposed site for the day school, and therefore has failed to establish that the Council's denial of a special use permit has made its exercise of religious beliefs impracticable.

18

The courts have found that secular activities do not become acts of faith just because they occur on church property. For example, in *Living Water Church of God v. Charter Township of Meridian*, 258 Fed. App'x 729 (6th Cir. 2007), the plaintiff was denied zoning clearance to construct a gymnasium for its religiously-affiliated school. The Sixth Circuit held that the denial did not amount to a substantial burden. The court held that a substantial burden must be more than a mere inconvenience on religious exercise. *Id.* at 739 ("[W]e are hard-pressed to conclude that Living Water will be unable to carry out its church missions and ministries without [the gymnasium], nor do we believe that mere inconvenience equates to a substantial burden.").

This Court agrees with the *Living Water* standard. There is no evidence that Calvary will be unable to carry out its church missions, since the church itself is still operational, and Calvary has so far failed to show a lack of alternative sites for the day school, or that any alternative site would be more than a mere inconvenience for Calvary.

In an analysis similar to that of *Living Water*, a Michigan state court held that a government regulation does not create a substantial burden on religious activity when it only makes it more difficult to practice the religion. *Shepherd Montessori Ctr. v. Ann Arbor Charter Twp.*, 259 Mich. App. 315, 330, 675 N.W.2d 271, 281 (2003). The *Shepherd* decision is of particular interest because it outlined various factors that can be used to determine whether a government regulation imposes a substantial burden:

> whether there are alternative locations in the area that would allow the school consistent with the zoning laws; the actual availability of alternative property, either by sale or lease, in the area; the availability of property that would be suitable for a K-3 school; the proximity of the homes of parents who would send their children to the school; and the economic burdens of alternative locations.

*Id.* at 332-333, 675 N.W. at 282. Calvary has not yet shown sufficient evidence to meet these criteria. Rather, Calvary has stated, in conclusory fashion, that the City offers no viable

19

alternative sites for the day school.  Moreover, Calvary has not addressed the burden issue from a financial standpoint; the Complaint merely concluded that Fairwinds day school would cease to run without the special use permit.

Thus, based on the criteria mentioned above, the Court finds that Calvary has not shown a likelihood that at the trial of this case the Court will conclude that the denial of the special use permit imposed a substantial burden on its religious exercise.[7]

### B. Irreparable Harm in the Absence of Preliminary Injunctive Relief

Pursuant to *Real Truth About Obama*, in addition to establishing that it is likely to succeed on the merits, Calvary must also establish that it will suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, and that an injunction is in the public interest.  Calvary sets forth two arguments for its contention that it will suffer irreparable harm in the absence of preliminary relief.  First, Calvary contends that the denial of its ability to freely exercise its faith constitutes irreparable injury.  Certainly, every day that Fairwinds does not operate on church property is an irretrievable day, and, in that sense, is irreparable.  But, as discussed above, the loss is not central to the church's religious activities. Hence, the irreparable harm is less significant than it might be, and does not justify mandatory relief.  More importantly, Calvary offers no evidence that the church and school cannot work to allow the operations to open elsewhere.

Second, Calvary contends that Fairwinds has no current facility, and without the preliminary injunction, Fairwinds will have to turn away students who are in need of its services. Perhaps so, but the students will suffer no harm.  According to the plaintiffs, the proposed

---

[7] Given the Court's conclusion above, it need not address the issues the other issues under RLUIPA—whether Fredericksburg had a compelling interest for its action and whether its decision is narrowly tailored to serve the compelling interest.

students will have IEPs from their local schools mandating that they have a private placement. The Individuals with Disabilities Education Act requires that the local schools provide a free appropriate public education for the students. *See* 20 U.S.C. § 1400, *et seq.*; *Shaw v. West*, 364 F. App'x 47, 48-49 (4th Cir. 2010); *A.B. v. Lawson*, 354 F.3d 315, 318 (4th Cir. 2004) Presumably, the local schools will find facilities that satisfy the IEPs.

Moreover, the Court notes that Fairwinds has previously operated in two different locations, moving when the school was notified that it needed a zoning permit. Apparently, the school is able to locate friendly landlords easily. In addition, the record contains no evidence about the presence or absence of facilities other than Fairwinds to accommodate the students, or the presence or absence of other facilities in which the church could house the school.

Finally, the Court notes that the City denied the special use permit on November 23, 2010. Under Virginia law, Calvary had thirty days to file an action in state court challenging the denial. Va. Code. § 15.2-2285(F). Instead, Calvary waited six months to file the instant case on May 23, 2011. Calvary's delay in filing suit calls into question Calvary's assertion that the harm suffered is truly irreparable.

Thus, the Court finds that Calvary has not established that will suffer irreparable harm in the absence of preliminary relief.

### C. Balance of the Equities

A mandatory preliminary injunction requires another party to perform a positive act; in this case, Calvary requests that the Court order the City to grant its application for a special use permit and allow Calvary to operate Fairwinds on its property. This type of relief alters the status quo and should be treated with caution. *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003). While Calvary has an interest in setting up the school, the City has a

strong interest in administering its zoning laws for the benefit of everyone in the City. Calvary has not shown that its interest outweighs the City's, so the balance of equities does not favor Calvary.

### D. Whether an Injunction Is in the Public Interest

While the public may have an interest in providing facilities for the disabled, Calvary has not shown that the failure of Fairwinds to operate on Calvary's property will harm that interest. There are other similar facilities in the area, and at least some of the children that were previously enrolled with Fairwinds are now attending those facilities. Given that a preliminary injunction is an extraordinary remedy, the Court finds that Calvary has not established that an injunction is in the public interest.

### IV. Conclusion

For the reasons stated above, the Court DENIES Calvary's motion for a preliminary injunction.

The Court will enter an appropriate order.

/s/
John A. Gibney, Jr.
United States District Judge

Date: July 18, 2011
Richmond, VA

22